**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and BRANCH, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**June 3, 2013**

# In the Court of Appeals of Georgia

A13A0373. OGLETREE v. THE STATE.                    PH-015C

PHIPPS, Presiding Judge.

Randall Floyd Ogletree was indicted for committing six sexual offenses against his seven-year-old granddaughter, K. O.; a six-year-old girl, C. B., whose father lived next door to him; and a mentally disabled seventeen-year-old female, D. C, who also lived next door to him. Specifically, the indictment alleged that Ogletree had committed against K. O.: (i) child molestation, by placing his hand on the child's vaginal area; (ii) child molestation, by showing the child photographs depicting nude persons and persons performing sexual acts; and (iii) enticing a child for indecent purposes, by soliciting and taking the child to a building for the purpose of child molestation and indecent acts. The indictment alleged that Ogletree had committed against C. B.: (iv) child molestation, by showing her photographs depicting nude

persons and persons performing sexual acts; and (v) enticing a child for indecent purposes, by soliciting and taking her to a wooded area for the purpose of child molestation and indecent acts. The sixth count of the indictment charged Ogletree with committing sexual battery against D. C., by making physical contact with her breasts. Ogletree was convicted as charged. On appeal, he contends that the trial court erred by denying his motion for a directed verdict of acquittal on the sexual battery count, by failing to instruct the jury on the defense of accident, and by denying his motion for mistrial. We affirm.

The state's evidence showed the following. At the time in question, Ogletree and his wife lived next door to his son and his son's family, which included seven-year-old K. O. K. O.'s mother testified that, on April 11, 2011, K. O. told her that her grandfather (Ogletree) had been showing her books with pictures of naked people and that he kept the books in the "barn" in his backyard. The child also told her mother that, on one occasion when her grandfather had taken her riding on a four-wheeler to what the child called a "tree house," Ogletree unzipped his pants and told her to look at him. The child told her mother further that her grandfather had told her not to tell anyone about those instances because, if she did, he would be in trouble.

The mother related K. O.'s allegations to her husband. When K. O.'s father talked to K. O., she told him that Ogletree had touched her private area, as she made a gesture with her hand. And she told him that Ogletree had taken her on four-wheeler rides to a tree house, which she described was through the woods and past a gate, and surrounded by flowers. K. O.'s father went to Ogletree's house, but only his wife was at home. Ogletree's wife followed K. O.'s father back to his own residence and confronted her husband's grandchild: "Do you know that your papa is going to lose his job? He's going to lose the house. He's going to lose everything if you tell these lies on him. He would not ever do this to you." She yelled at the child, and repeatedly told her, "You're lying, you need to stop lying right now."

K. O.'s father contacted the police. That same day, April 11, a law enforcement officer went to Ogletree's residence. The officer testified that Ogletree retrieved pornographic magazines from a storage building behind his house and handed them to him.

A couple who lived in the residence on the other side of the Ogletrees' residence was visiting the Ogletrees when Ogletree led the law enforcement officer to the small building in his back yard, retrieved therefrom pornographic magazines, and handed them to the officer. The man testified that, based on the events that

3

occurred and statements made to him at that time, he became concerned about whether Ogletree had engaged in inappropriate conduct either with his young daughter, then six-year-old C. B., or with his seventeen-year-old sister-in-law D. C., who functioned mentally as a seven- or eight-year-old child and who lived in his home.

As a result of the foregoing, K. O., C. B., and D. C. were interviewed by a forensic interviewer. K. O. said the following during her interview, which was conducted on April 12, 2011. Ogletree had led her to the small building behind his house, picked her up, then touched her vaginal area with his finger. Even though she had her clothes on, she said, "you could feel through my clothes" what he was doing – the child motioned with her finger. Ogletree had asked her whether she liked it when he "tickled her button"; when she said no, he put her down, and she ran inside the house where her grandmother was. K. O. told the interviewer that Ogletree had touched her that way before and called it "tickling her button." On another occasion, about two months before the interview, as K. O. recalled, Ogletree drove her on his four-wheeler to a tree house, where he picked up a magazine, pointed to pictures, and told her to look. The pictures depicted naked adults; there were "boys peeing in girls' mouths" and something of a whitish color was coming out of the girls' mouths. K. O.

4

also said during her interview that Ogletree had made her swear not to tell anyone about his showing her those pictures. An audiovisual recording of this child's forensic interview was played for the jury.

C. B. said the following during her forensic interview, which was conducted on April 14, 2011. Ogletree had used his four-wheeler to take her and K. O. camping in a "tent" in the woods. There, he had shown the girls pictures of grownups wearing no clothes, grownups who were holding up their shirts, and grownups who were pulling down their pants. Ogletree had been teaching her and K. O. about certain male and female body parts, as she so designated: those parts that should not be touched. An audiovisual recording of this child's forensic interview was played for the jury.

Based on K. O.'s disclosures to her father, he and C. B.'s father searched for and found the "tree house" that she had described. Approximately 100 yards from K. O.'s residence, down a dirt path, through the woods, past a gate, and adjacent to a field of flowers, was a deer stand. It stood about five or six feet tall; it had four walls, a roof, and a window; about two or three people could fit inside it. And leading to the deer stand was a four-wheeler trail.

K. O. was eight years old when she testified at trial in November 2011. She stated that, when she was six or seven years old, Ogletree touched her private area

and showed her "nasty" pictures that made her uncomfortable; one picture was of "a boy peeing in a girl's mouth," and neither the boy nor the girl in the picture was wearing any clothes.

C. B. was six years old when she testified at trial. She stated that, when she was five years old, she and Ogletree rode a four-wheeler into the woods; while in the woods, Ogletree showed her magazines with "coupons or stuff" and pictures of boys and girls who *were* wearing clothes; and "then we came right back to his house for the other kids to ride." When asked what she thought of Ogletree, she answered, "He's nice. I like him really a lot because when I'm there he usually gives me candy and cookies." Later during her testimony, C. B. stated that on the back of the magazines were pictures of boys and girls who were *not* wearing any clothes. Afterward, on re-direct, when the child was asked what her mother had told her to say, she answered, "Told me to say that I love [Ogletree] a lot and that he always give me candy but not really before dinner because it's not really good for you and he loves me and I love him."

Seventeen-year-old D. C. testified that Ogletree was her neighbor, that he had touched her breast, and that she had not wanted him to do so. The touching, she said, had occurred when she was riding her bicycle at a neighbor's birthday party.

Ogletree called several witnesses who all testified that he had a good reputation in the community and that they would believe him under oath. Forty-eight years old at his trial, Ogletree also took the stand and denied all charges. He admitted that he had given four-wheeler rides to K. O., as well as to his other grandchildren and to C. B. and D. C. But he denied ever taking either C. B. or D. C. out of his own yard, and denied ever showing C. B. any pornography or pictures depicting nudity.

Ogletree admitted, however, taking K. O. to the deer stand, which he described as "built more like a house, straight up. Windows around it like a shooting house. Has a tall ladder," with steps that "are pretty far apart." To explain a possible, but inadvertent, touching of the girl's vaginal area, Ogletree testified that, once,

> [K. O.] wanted to see the deer stand and see out of it. She had started up [the steps] and froze up and didn't want to move. I said well, just come back down and we'll go. She said, no, paw-paw. I want to see. I want to see. So I went up behind her and put my hand on her butt and pushed her on up the steps to make her go up. That's as far as it went. I did take my hand, and I might have touched her in the wrong direction. But it's never intentional. That's my baby.

Ogletree denied ever unzipping his pants while in the deer stand.

Ogletree claimed that the pornographic magazines that he had stored in the backyard building belonged to his brother. He denied showing them or any

pornographic images to K. O. However, once, after opening the building to take out his four-wheeler, he testified, he discovered K. O. looking at one of the magazines, chastised her, and took it from her.

Ogletree denied ever inappropriately touching D. C., but acknowledged, "I would pick at her" when she sometimes rode her bike. Ogletree recalled that, at a birthday party,

> I was picking at her, yes, juking her on her arms and on her sides. She had told her sister I had touched her. Me picking at her, I don't know if I did or not so I stopped what I was doing. I apologized immediately to her and her sister. Even if I did, I didn't realize I had done it. So I had stopped and apologized to both of them.

Given Ogletree's claim that he had not intentionally touched D. C.'s breast, the state called two rebuttal witnesses.[1] K. O.'s mother testified that, in September 2010, when she was pregnant with her last child, she walked past Ogletree when visiting his and his wife's home, and "he flicked my breast. . . . It wasn't a grab, it wasn't a pinch; it was just with his hand." She testified that Ogletree lifted her breast; that there was nothing else he might have been reaching for, other than to grab her breast; and that,

---

[1] The trial court ruled that these witnesses' testimony was admissible to show Ogletree's course of conduct and bent of mind, and instructed the jury on these permissible uses of similar transaction evidence.

afterward, Ogletree began laughing. K. O.'s mother testified that Ogletree's wife was nearby when the incident occurred.

The other rebuttal witness was C. B.'s mother, who testified that around 2009, when Ogletree was once visiting her home, she was carrying on her hip then three- or four-year old C. B., and that "[Ogletree] was acting like he was going to pinch [the toddler] and reached over with his other hand and grabbed my breast." She testified that it was not accidental, that he squeezed her breast.

Then, Ogletree called his wife to the stand. She recalled an incident in September 2010 when K. O.'s mother, then about four or five months pregnant, was at their home for breakfast. The three adults were in the kitchen together, and as "[K. O.'s mother] was coming up behind him," Ogletree turned around and "may have brushed her breast, but he did not grab her breast or anything else."

1. Ogletree contends that the trial court should have granted a directed verdict of acquittal on the sexual battery count, which pertained to D. C.

> The standard for reviewing a denial of a motion for a directed verdict of acquittal is the same test to be used when the sufficiency of the evidence is challenged, i.e., under the rule of *Jackson v. Virginia*,[2] whether the

---

[2] 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979) (holding that, when an appellant challenges the sufficiency of the evidence to support the

9

evidence was sufficient for a rational trier of fact to find beyond a reasonable doubt that the defendant was guilty of the charged offense.[3]

(a) Ogletree asserts, "[D. C.] did not testify that Appellant specifically touched her breasts, she testified that he touched her and made some type of physical gesture during her testimony."

But the trial transcript reveals more. When D. C. was asked where Ogletree had touched her, she answered, "Right here," as she physically indicated a location. The prosecutor requested that the record reflect that D. C. had pointed to her breast. With no objection from the defense, the trial court responded, "Okay." Additionally, after D. C. testified, defense counsel expressly agreed, "Your Honor, I believe that when [D. C.] testified she indicated that she'd been touched on the breast while she was on her bicycle. That's what the State alleges in their indictment. So she did testify to that."

---

conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt").

[3] *Dorsey v. State*, 279 Ga. 534, 542 (3) (615 SE2d 512) (2005) (citations omitted).

In light of the record and transcript before us, Ogletree's assertion provides no basis for reversal.[4]

(b) Ogletree argues that the state failed to prove venue as to that count.[5] But D. C. testified that Ogletree had touched her while they were at a certain person's birthday party, and another witness testified that that party occurred in Troup County, the county in which Ogletree was tried.[6] Ogletree's argument is hence not supported by the record.

---

[4] See *Jackson*, supra; *Jenkins v. State*, 284 Ga. 642, 646 (4) (670 SE2d 425) (2008) (holding that evidence, as stipulated at a trial, was sufficient to find beyond a reasonable doubt that appellant was guilty under standard of *Jackson*, supra); OCGA § 24-4-8 (2011) ("The testimony of a single witness is generally sufficient to establish a fact."); see generally *Hodges v. Hodges*, 261 Ga. 843, 844 (1) (413 SE2d 191) (1992) (noting that a "stipulation is any agreement made by attorneys respecting business before the court"); *Benton v. State*, 286 Ga. App. 736 (649 SE2d 793) (2007) (explaining that an appellant bears the burden of showing error affirmatively by the record, and if the transcript does not fully disclose what transpired at trial, it is the duty of the complaining party to complete the record pursuant to OCGA § 5-6-41(f)).

[5] See Ga. Const. of 1983, Art. VI, Sec. II, Par. VI (providing that "all criminal cases shall be tried in the county where the crime was committed"); OCGA § 17-2-2 (a) ("Criminal actions shall be tried in the county where the crime was committed, except as otherwise provided by law."); *Jones v. State*, 272 Ga. 900, 902-903 (2) (537 SE2d 80) (2000) (holding that the state must come forth in all criminal prosecutions with evidence to show beyond a reasonable doubt that venue is properly laid).

[6] See *Jones*, supra at 902-903 (2) (explaining that the state may prove venue using either direct or circumstantial evidence).

2. Ogletree contends that the trial court committed reversible error by failing to instruct the jury regarding the defense of accident. "The effect of accident on guilt is set forth in OCGA § 16-2-2: 'A person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or undertaking, intention, or criminal negligence.'"[7] "To authorize a jury instruction on a subject, there need only be produced at trial slight evidence supporting the theory of the charge. Whether the evidence presented is sufficient to authorize the giving of a charge is a question of law."[8]

Ogletree argues that his testimony authorized a charge on accident, which he claims was his sole defense as to three counts of the indictment. But Ogletree's trial counsel did not request a charge on accident, nor did he

> object to the court's failure to include such [a charge] before the jury retired to deliberate. Accordingly, pursuant to [the] recent decision in

---

[7] *Wilson v. State*, 279 Ga. 104, 105 (2) (610 SE2d 66) (2005), quoting OCGA § 16-2-2.

[8] *Jones v. State*, 287 Ga. 770, 771-772 (2) (700 SE2d 350) (2010) (citation and punctuation omitted).

*State v. Kelly*,[9] and OCGA § 17-8-58 (b),[10] we review this enumeration of error only to determine whether the court's failure to include a specific instruction on . . . [accident] constitutes plain error.[11]

---

[9] 290 Ga. 29 (718 SE2d 232) (2011).

[10] OCGA § 17-8-58 provides:
(a) Any party who objects to any portion of the charge to the jury or the failure to charge the jury shall inform the court of the specific objection and the grounds for such objection before the jury retires to deliberate. Such objections shall be done outside of the jury's hearing and presence.
(b) Failure to object in accordance with subsection (a) of this Code section shall preclude appellate review of such portion of the jury charge, unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties. Such plain error may be considered on appeal even if it was not brought to the court's attention as provided in subsection (a) of this Code section.

[11] *Allen v. State*, 290 Ga. 743, 744-745 (3) (723 SE2d 684) (2012); see *Gamble v. State*, 291 Ga. 581, 583 (4) (731 SE2d 758) (2012) (because no objection was made to the jury instruction at trial, any alleged error in that charge is subject to "plain error" review under *Kelly*, supra); *McLean v. State*, 291 Ga. 873, 876 (4) (738 SE2d 267) (2012) (where record contains no written request, no oral request during the charge conference for instruction, and no objection to the court's failure to give instruction, appellate review is limited to a determination of whether the trial court's instruction constituted "plain error" under *Kelly*, supra); *Wilson v. State*, 291 Ga. 458, 459 (729 SE2d 364) (2012); *Kelly*, supra at 32-33 (2) (a).

"In *Kelly*, [the Supreme Court of Georgia] adopted the federal definition of plain error from *United States v. Olano*,[12] as well as its four-pronged test."[13]

> First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.[14]

Ogletree has not specified how, or even asserted that, the "plain error" standard has been satisfied. Having nevertheless examined the record, we conclude that the test is not satisfied for any of the three counts at issue here.[15]

---

[12] 507 U. S. 725 (II) (113 SCt 1770, 123 LE2d 508) (1993).

[13] *Guajardo v. State*, 290 Ga. 172, 175-176 (4) (718 SE2d 292) (2011) (footnote omitted); see *Allen*, supra at 745 (3).

[14] *Kelly*, supra at 33 (2) (a) (citation, punctuation and emphasis omitted); see *Guajardo*, supra at 176 (4), n. 3 (stating four-pronged test set forth in *Olano*).

[15] "While we will review properly enumerated and argued claims of jury instruction error regardless of whether the appealing party specifically casts the

14

(a) First, Ogletree claims that he was entitled to an instruction on accident as a defense to the charge of child molestation committed against K. O., by showing the child photographs depicting nude persons and persons performing sexual acts. "A person commits the offense of child molestation when such person . . . [d]oes any immoral or indecent act to or in the presence of or with any child under the age of 16 years with the intent to arouse or satisfy the sexual desires of either the child or the person."[16] Ogletree claims that an instruction on accident was authorized by his testimony that he never showed any pornographic magazines or images to K. O., although he had once discovered the child looking at such materials and taken the materials from her.

But by that testimony, Ogletree *denied* having done the acts that formed the basis of the charged crime. To establish an evidentiary foundation for an instruction on the defense of accident, "the defendant must admit to having committed an act that would constitute the crime charged, but claim that the act was done

_____

alleged infirmity as 'plain error,' parties should be advised that the hurdle to establishing plain error is high, . . . and therefore that the failure to specifically articulate how the alleged error satisfies *this high standard* increases the likelihood that their claims in this regard will be rejected." *Kelly*, supra at 32 (1), n. 2 (emphasis supplied).

[16] OCGA § 16-6-4 (a) (1).

15

unintentionally."[17] "Since [Ogletree] denied doing the[ ] acts that formed the basis of [the] charge[ ] against him, his testimony could not form the basis for the requested jury instruction on accident."[18] Hence, with respect to that count of the indictment, the court's failure to include a specific instruction on accident does not constitute plain error.[19]

(b) The remaining two counts that Ogletree cites are: (i) child molestation committed against K. O., by placing his hand on the child's vaginal area; and (ii) sexual battery committed against D. C., by touching her breast. Regarding the first of those two counts, Ogletree claims that a charge on accident was authorized by his testimony about assisting K. O. climb the ladder of the deer stand: "I went up behind her and put my hand on her butt and pushed her up the steps to make her go up. That's as far as it went. I did take my hand, and I might have touched her in the wrong direction. But it's never intentional." Regarding the second of those two counts,

---

[17] *Manders v. State*, 281 Ga. App. 786, 790 (3) (637 SE2d 460) (2006) (citations and punctuation omitted); see *Mangrum v. State*, 285 Ga. 676, 680 (6) (681 SE2d 130) (2009) (explaining that, if a defendant does not admit to committing any act which constitutes the offense charged, he is not entitled to a charge on the defense of accident).

[18] *Manders*, supra at 790-791 (3) (citation omitted); see *Mangrum*, supra.

[19] See *Kelly*, supra (explaining that four-prong test must be satisfied).

16

Ogletree claims that a charge on accident was authorized by his testimony that he had never touched D. C. inappropriately, although he had been "picking at her" and "juking her on her arms and on her sides."

The defense of accident "applies where the evidence negates the defendant's criminal intent, whatever that intent element is for the crime at issue."[20] "We view the trial court's jury charges as a whole to determine whether the jury was fully and fairly instructed on the law of the case."[21] Here, "to the extent that the omission [of a specific instruction on accident] was error,[22] there is no likelihood that it affected

---

[20] *State v. Ogilvie*, 292 Ga. 6, 9 (2) (b) (734 SE2d 50) (2012); see *Metts v. State*, 210 Ga. App. 197, 198 (2) (435 SE2d 525) (1993) ("The essence of the defense of accident is that the defendant's act is not intentional.").

[21] *Davis v. State*, 290 Ga. 757, 761 (5) (725 SE2d 280) (2012) (citation and punctuation omitted); see *Curry v. State*, 291 Ga. 446, 454 (6) (729 SE2d 370) (2012).

[22] Compare *Manders*, supra at 791 (3) (concluding that defendant was not entitled to a jury charge on accident because it was not sufficient for defendant to take the stand and merely speculate about possible alternative scenarios of how the incident transpired; rather, defendant was required to admit the underlying act that formed the basis for the charge, which he failed to do), with *Metts*, supra at 198 (2) (concluding that defendant was entitled to a jury charge on accident as a defense to the child molestation count, where victim testified that defendant touched victim's penis by placing defendant's hand on the outside of victim's pajamas, and where defendant denied he intentionally touched the victim in the manner alleged and claimed that, while sleeping in the same bed with the boy, he may have unintentionally touched him).

17

the outcome of the trial, as the court instructed the jury on the law regarding criminal intent, including that it is an element of all crimes charged; [and] the State's burden to prove all elements of the crimes charged beyond a reasonable doubt."[23] Because the court's charge, when considered as a whole, fully and fairly instructed the jury that it had the duty to acquit Ogletree if it determined that the state had failed to prove

---

[23] *McLean*, supra at 877 (4) (citation omitted); *Sydenstricker v. State*, 209 Ga. App. 418, 419-420 (2) (433 SE2d 644) (1993) (determining that charges as a whole adequately addressed the primary defense that sought to negate the intent element of charged crime). See generally *Alatise v. State*, 291 Ga. 428, 430 (2) (728 SE2d 592) (2012) (pretermitting whether the defendant met his burden with regard to the first and second prongs of the *Kelly* test, yet determining that plain error under *Kelly* test was not established because the omission of a specific instruction did not affect the outcome of the trial proceedings, where a review of the charge in its entirety showed that any error in the omission of a specific charge was harmless); *Allen*, supra at 745-746 (3) (concluding that, in light of the trial court's charge as a whole, the omission of a specific instruction did not amount to plain error under *Kelly* because there was no likelihood the omission affected the outcome of the trial proceedings); Accord *Scott v. State*, 290 Ga. 883, 886 (4) (725 SE2d 305) (2012) (concluding that defendant had failed to demonstrate plain error under *Kelly*, where defendant complained that trial court had failed to charge that the state bore the burden of disproving his alibi defense beyond a reasonable doubt, where consideration of the charge as a whole showed that the trial court completely and correctly instructed the jury on the defendant's presumption of innocence, the state's burden to prove beyond a reasonable doubt that the defendant committed the crimes at issue, and on assessment of the credibility of witnesses).

his guilt beyond a reasonable doubt, it was not plain error under *Kelly* not to give a specific charge on accident.[24]

3. Ogletree contends that the trial court erred by not declaring a mistrial when, during cross-examination, the prosecutor posed to him, "Now, you went to see the psychosexual behavior therapist –." Defense counsel cut short the prosecutor's question with an objection. Then, outside the presence of the jury, defense counsel asserted that the question called for improper character evidence and requested that the court declare a mistrial. The trial court sustained the objection, but declined to declare a mistrial. Defense counsel withdrew an earlier request for curative instruction, stating that he did not "want to bring it to [the juror's] attention again." Thus, when the court recalled the jury into the courtroom, the court directed the prosecutor to resume cross-examination, at which point the prosecutor announced that he had no further questions.

Ogletree maintains on appeal that the prosecutor's question was prejudicial in that it implied that he had seen a psychosexual behavior therapist to seek treatment

---

[24] See *McLean*, supra; *Sydenstricker*, supra; *Davis*, supra; *Curry*, supra. See generally *Edmonds v. State*, 275 Ga. 450, 454 (4) (569 SE2d 530) (2002) (even assuming that a legal principal, which pertained to defendant's sole defense, was in issue, the failure to specifically charge on that principle did not require reversal because the defendant's defense was nevertheless fairly presented to the jury).

19

because he had committed the charged offenses. "When prejudicial matter is improperly placed before the jury, a mistrial is appropriate if it is essential to the preservation of the defendant's right to a fair trial. Whether the statements are so prejudicial as to warrant a mistrial is within the trial court's discretion."[25]

This court has held that an unanswered question does not furnish grounds for a mistrial.[26] Here, the prosecutor's question was truncated by objection, the trial court sustained the objection, and the question was left unanswered. Though the trial court might have issued a curative instruction, defense counsel expressed his apparently tactical decision not to have the jurors be reminded of the matter. Nothing in the record indicates – and Ogletree makes no assertion – that the prosecutor either resumed that line of inquiry or thereafter alluded to it during the state's closing argument.

---

[25] *White v. State*, 268 Ga. 28, 32 (4) (486 SE2d 338) (1997) (citations omitted).

[26] See *Warren v. State*, 314 Ga. App. 477, 480 (2) (a) (724 SE2d 404) (2012) (concluding that the trial court did not abuse its discretion in denying motion for mistrial, where the witness did not answer the question and, upon objection, the prosecutor withdrew the question and the trial court instructed the jury to disregard it); *Berry v. State*, 210 Ga. App. 789, 791 (4) (437 SE2d 630) (1993) (concluding that an unanswered question did not furnish grounds for a mistrial); *Middlebrooks v. State*, 169 Ga. App. 507, 509 (313 SE2d 764) (1984).

But even assuming that the prosecutor's truncated and abandoned question was nevertheless improper, and assuming further that the trial court committed error under OCGA § 17-8-75,[27] reversal of Ogletree's judgment of conviction is not warranted. "[I]t is fundamental that harm as well as error must be shown for reversal."[28] Here, K. O. made explicit allegations, during her forensic interview, of Ogletree's acts that formed the basis of the charges concerning her, as did C. B. with respect to the acts that formed the basis of the charges concerning her. Both girls testified to the same at trial. Their accounts of Ogletree's conduct were corroborated by the evidence of the deer stand and the pornographic materials that Ogletree stored in his backyard storage shed along with his four-wheeler. Furthermore, D. C. described at trial the act that formed the basis of the charge concerning her. And the state presented evidence

---

[27] ("Where counsel in the hearing of the jury make statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same. On objection made, the court shall also rebuke the counsel and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds; or, in his discretion, he may order a mistrial if the prosecuting attorney is the offender."). See *O'Neal v. State*, 288 Ga. 219, 220-222 (1) (702 SE2d 288) (2010) (explaining that the plain language of OCGA § 17-8-75 refers to trial court's independent duty, after defense counsel's objection, to rebuke the prosecutor, give an appropriate curative instruction, or grant a mistrial in the event that the prosecutor has injected into the case prejudicial statements on matters outside of the evidence).

[28] *O'Neal*, supra at 223 (2) (citations and punctuation omitted).

that Ogletree had groped the breasts of two other women without their consent. Moreover, the trial court charged the jury fully as to what constituted evidence, including instructing them that evidence did not include the questions asked by the lawyers. "All things considered, including the strength of the State's evidence in this case, we conclude that it is highly probable that [any] trial court[ ] error in failing to comply with OCGA § 17-8-75 did not contribute to the verdicts."[29]

Given the circumstances of this case, the trial court committed no reversible error in denying Ogletree's motion for a mistrial.[30] Neither *Tyler v. State*[31] nor

---

[29] *Arrington v. State*, 286 Ga. 335, 346 (16) (a) (687 SE2d 438) (2009); see *Collins v. State*, 289 Ga. 666, 668 (2) (715 SE2d 136) (2011) ("Despite the improper questioning by the prosecutor, reversal of the conviction is not warranted, where there is overwhelming evidence of guilt or overwhelming evidence refuting the defendant's claim of [an affirmative defense].") (citations omitted); *O'Neal*, supra.

[30] See *Collins*, supra at 667-669 (holding that, while the prosecutor's question was improper, in light of the overwhelming evidence, there was no reversible error in the denial of defendant's motion for mistrial); see also *O'Neal*, supra; *Arrington*, supra.

[31] 266 Ga. App. 221, 223-224 (2) (596 SE2d 651) (2004) (reversing conviction, where testimony elicited by the prosecutor amounted to irrelevant and prejudicial hearsay, where the trial court made an inappropriate remark concerning the testimony, where the trial court failed to perform the duties imposed by OCGA § 17-8-75, and where the evidence was "far from overwhelming").

*Coleman v. State*,[32] the cases upon which Ogletree relies, mandates a conclusion in his favor.

*Judgment affirmed. Ellington, C. J., and Branch, J., concur.*

---

[32] 308 Ga. App. 731, 735-736 (2) (708 SE2d 638) (2011) (physical precedent only). See Court of Appeals Rule 33 (a) (concerning divisions that are physical precedent only).